IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WAYNE MARTIN,                           )
    Plaintiff,                          )
                                        )
    v.                                  )       Civil No. 3:13cv35 (HEH)
                                        )
CAROLYN W. COLVIN,                      )
Commissioner of Social Security,        )
    Defendant.                          )
_____)

## REPORT AND RECOMMENDATION

Wayne Martin ("Plaintiff") is 51 years old and previously worked as a supervisor at a juvenile detention center. On February 19, 2010, Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act ("Act") with an amended alleged onset date of February 23, 2009, claiming disability due to degenerative disc disease of the lumbar spine. Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff's claims were presented to an administrative law judge ("ALJ"), who denied Plaintiff's claims. The Appeals Council subsequently denied Plaintiff's request for review on November 14, 2012.

Plaintiff now challenges the ALJ's denial of DIB, asserting that the ALJ incorrectly assessed the weight afforded to Plaintiff's treating physician's opinion and Plaintiff's credibility; therefore, substantial evidence does not support the ALJ's determination that Plaintiff maintained the ability to perform light work. (Pl.'s Mem. in Supp. of Mot. for Summ. Judg. ("Pl.'s Mem.") (ECF. No. 7) at 16-30.) Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary

judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record in this case,[1] the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 9) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

### A. Plaintiff's Education and Work History

Plaintiff attended college, but did not receive a degree. (R. at 29.) Before his injury, he worked for approximately fifteen years as a supervisor at a juvenile detention center. (R. at 30-31.)

### B. Plaintiff's Medical History

Plaintiff injured his back on April 20, 2005, though the record conflicts as to which incident occurred on that day — he either fell on his buttocks and hurt his back during an altercation or slipped on some detergent on the floor and twisted his back while lifting a laundry basket. (R. at 379, 518.) His back was further injured in 2005 when an inmate "came across the desk on top of [him]" during the intake procedure. (R. at 518.)

Plaintiff worked from April 2005 to August 2007, "on and off modified duty." (R. at 262.) On October 17, 2005, an MRI by Dr. Paul Rubis revealed a posterocentral protrusion of

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

disc with slight left posterior paracentral asymmetry with no significant stenosis, degenerative disc disease with no disc herniation or stenosis and annular bulging and facet arthropathy with no disc herniation or stenosis. (R. at 394.) In August 2007, another MRI showed extremely similar results. (R. at 392.)

In August of 2007, Plaintiff intended to undergo back surgery and went on modified duty pending that surgery. (R. at 262.) Ultimately, Plaintiff underwent physical therapy, but did not follow through on the recommended surgery. (R. at 311.) On February 7, 2008, Plaintiff met with Dr. Daniel Martin and stated that he was not ready for surgery. (R. at 323.)

On April 10, 2008, Plaintiff again met with Dr. Martin and received two steroid injections, which provided about ten days of relief before gradual return of pain. (R. at 321.) Plaintiff complained that physical therapy provided no relief and Dr. Martin further encouraged Plaintiff to reconsider surgery. (R. at 321.) Dr. Martin referred Plaintiff to Dr. Claiborne Irby and restricted Plaintiff's work to sedentary duty, four hours a day. (R. at 262, 321, 363.)

On April 22, 2008, Plaintiff met with Dr. Irby, who found "[l]eft leg sciatica, no right leg pain, no real back pain," and that while the first injection afforded Plaintiff about a month's relief, the second injection only provided a few weeks of relief. (R. at 319.) Dr. Irby spoke with Plaintiff in depth about the details of surgery and the potential side-effects; however, Plaintiff wanted to try another injection. (R. at 319.)

On May 28, 2008, Dr. Martin administered another steroid injection. (R. at 328-29.) On June 5, 2008, Plaintiff had an exam with Dr. Joseph Andriano, who concurred with the previous restrictions — recommending that Plaintiff remain on sedentary duty for four hours a day. (R. at 262.) On June 26, 2008, Plaintiff had another appointment with Dr. Martin, who noted a continued positive straight leg raise ("SLR") at 90 degrees on his left leg, encouraged Plaintiff to

follow up with Dr. Irby for surgical evaluation and instructed him to continue on light sedentary duty. (R. at 316.)

On July 2, 2008, Plaintiff again saw Dr. Irby, who found a positive SLR for Plaintiff's left leg at about 70 degrees and went over options for treatment. (R. at 315.) Plaintiff wanted to proceed with surgery in September, so Dr. Irby answered questions and explained the complications. (R. at 315.) Dr. Irby opined that Plaintiff needed a left L5-S1 microdiskectomy, but should continue with limited duty. (R. at 315.)

On September 19, 2008, another MRI revealed mild degenerative change to discs T12/L1, "a broad left posterolateral bulge versus left posterolateral disc protrusion at L5-S1," with no spinal or foraminal stenosis. (R. at 345.) Plaintiff's intervertebral discs were intact. (R. at 345.)

During a pre-surgical physical exam on September 25, 2008, Plaintiff complained of left lower back and buttocks pain and the examination revealed an SLR on the left at 60 to 70 degrees, and that 60 to 70 percent of his pain was from his back. (R. at 314.) Dr. Irby explained that because the majority of his pain was back pain, a microdiskectomy would not take care of his pain. (R. at 314.) Dr. Irby explained that a fusion would be the best way to address it. (R. at 314.) Dr. Irby ordered that Plaintiff continue with his current restrictions of working four hours a day. (R. at 314.)

On November 25, 2008, another office visit with Dr. Irby showed positive SLR on the left at 60 degrees for lower back pain. (R. at 313.) Dr. Irby opined that with no pre-injury history of trouble and with Plaintiff's developing back and leg pain, these degenerative changes were related to Plaintiff's injury. (R. at 313.) Further, Dr. Irby stated that he did not "have anything else to offer [Plaintiff] other than surgery or an FCE." (R. at 313.)

On January 26 and 27, 2009, Amanda Gallagher, M.S., P.T., C.W.C.E. completed a Functional Capacity Evaluation ("FCE"). (R. at 517.) Ms. Gallagher reported that Plaintiff demonstrated the ability to perform medium levels of work, as long as there were "reasonable restrictions placed on certain activities." (R. at 542.) She observed him holding his infant daughter, being able to standup without great difficulty and walk with a normal gait free of antalgia. (R. at 534.) Plaintiff reported that his pain had gotten worse, that he would seek surgery on his own private insurance if denied by worker's compensation and that he thought there were jobs in the city that were within his limitations. (R. at 519, 521.)

Plaintiff passed all balancing tests and performed all activities, but with some back pain. (R. at 520-21, 526.) Plaintiff walked 2,240 feet on a level terrain in ten minutes, with a regular gait pattern, but slowed over time. (R. at 525-26.) He demonstrated no signs of physical discomfort, did not lose balance, did not request a break, and completed a significant distance during the test. (R. at 525-26.) Plaintiff rated his pain at 3.25 out of 10 before the test and 3.5 out of 10 after the test. (R. at 526.)

Plaintiff could squat and crouch, move into a seated position on the floor and rise slowly from this seated position. (R. at 527.) Plaintiff had difficulty getting into a kneeling position, but once he was on the floor, he was able to complete most of the tested activities with minimal signs of discomfort or difficulty. (R. at 527.) Plaintiff was also able to crawl, but paused and slowed throughout the test. (R. at 528.) Plaintiff climbed and descended five floors of thirteen steps without a break and reported no change in back pain. (R. at 528.) He also climbed and descended a ladder without any signs of physical discomfort. (R. at 528-29.)

Ms. Gallagher found that Plaintiff could lift and carry approximately 20 to 30 pounds, carry 40 pounds for 30 feet and push or pull a 150-pound testing sled for 30 feet. (R. at 520,

5

531.) This activity, however, raised Plaintiff's pain from a rating of 3.5 to 4, and he needed to massage and stretch his low back. (R. at 531.)  Plaintiff stopped the lifting leg test because it increased Plaintiff's pain, but Ms. Gallagher noted that Plaintiff could lift 33 pounds.  (R. at 529-30.)  Ms. Gallagher observed Plaintiff sit for a total of two hours and eleven minutes with the longest duration being one hour and two minutes, and she saw him stand for a total of one hour and fifty-eight minutes with a longest duration being one hour and seven minutes.  (R. at 534.)

In Maximum Voluntary Effort Testing, Ms. Gallagher determined that "during constant distraction-based clinical testing, [Plaintiff]'s performance remained clinically consistent, suggestive of good consistent effort on his behalf. . . . Overall test findings, in combination with clinical observations, suggest the presence of full physical effort on [Plaintiff]'s behalf." (R. at 538.) In line with this, she found that competitive test performance examples were abundant throughout his testing day.  (R. at 537.)

In the Waddell Inappropriate Symptoms Questionnaire, which is used to gauge the reliability of patient's subjective reports of pain and limitations, Plaintiff's results demonstrated inappropriate illness behavior.  (R. at 538-39.)  Plaintiff did not complain of inappropriate pain during any placebo tests.  (R. at 539.)  Ms. Gallagher's noted that Plaintiff was "self-limited by back/leg pain and/or strength."  (R. at 531).  Ms. Gallagher summarized the reliability of pain and disability reports by saying that the overall inconsistencies were minor, but Plaintiff's subjective reports matched distraction-based clinical observations; however, Plaintiff generally could do more than he stated or perceived.  (R. at 542.)  Ms. Gallagher further indicated that the inconsistencies in his subjective reports and tests were significant, because his pain rating on the Functional Pain Scale would require that Plaintiff cease the activity, but Plaintiff reported tolerance for sitting and standing differed from that observed by Ms. Gallagher.  (R. at 542.)  Ms.

Gallagher concluded that Plaintiff would be capable of medium level of work "with the need for reasonable restrictions placed on certain activities." (R. at 542.) She assessed that Plaintiff might have been capable of returning to his previous position in a full-time capacity without significant accommodations. (R. at 542.)

On March 31, 2009, Dr. Irby opined that he did not anticipate further improvement of Plaintiff's symptoms and that Plaintiff could work at the sedentary level with allowance for position changes. (R. at 306-07.) During a May 28, 2009 visit with Dr. Irby, Plaintiff exhibited a positive SLR on the left at 60 degrees for left hip pain, but experienced a decreased left ankle reflex. (R. at 305.) On October 29, 2009, Dr. Irby gave Plaintiff another epidural steroid injection, noting a markedly positive SLR at 45 degrees for left hip pain with intact strength. (R. at 304.)

Plaintiff had another workers' compensation office visit with Dr. Irby on February 1, 2010, and complained of having an acute episode of severe pain. (R. at 303.) He stood well with strength intact, but had limited motion of the lumbar spine and a positive SLR at 45 degrees for low back pain. (R. at 303.) Plaintiff stated that he was not interested in surgery and would be filing for Social Security. (R. at 303.) Dr. Irby referred Plaintiff to Dr. Charles Bonner for chronic pain management. (R. at 303.)

On April 27, 2010, Plaintiff met with Dr. Bonner, who reported that Plaintiff had intact light touch sensation, reduced lumbosacral range of motion with stiffness and pain, tenderness to palpitation specifically in the right sacroiliac area, gluteal musculature, greater trochanter and iliotibial band, normal gait and station, negative SLR and no focal weakness, but a generalized weakness for his age and condition. (R. at 380.) Dr. Bonner set Plaintiff on a fitness program

and nutrition plan. (R. at 380.) Dr. Bonner continued Plaintiff's prescription for Hydrocodone, started him on Trazodone and renewed his Flexeril prescription. (R. at 380.)

On May 27, 2010, Dr. Bonner gave Plaintiff an epidural injection, and continued his treatment program and medications for Flexercil, Hydrocodone and Trazodone, as well as Senokot. (R. at 442-43.) On June 24, 2010, during an office visit with Dr. Bonner, Plaintiff indicated that the previous injection had not helped much, but that the medications alleviated some pain. (R. at 433.) On July 27, 2010, Plaintiff reported continued pain at a rate of eight out of ten and that activity made his pain worse. (R. at 437.) Nurse Practitioner Courtney Ash prescribed a TENS unit for Plaintiff. (R. at 437.)

On June 29, 2010, Plaintiff had a medical consultation with Dr. Nancy Powell. (R. at 366.) Plaintiff stated that he always had back pain, but did not claim a history of injury. (R. at 366.) His left leg pain began a year before, but he also had no injury to that leg. (R. at 366.) His daily activities included driving, reading and watching television. (R. at 367.) Dr. Powell observed Plaintiff "walk[ing] from waiting room to examination room with slight shuffle," and later leaving the building walking slowly with a slight shuffle. (R. at 368.) Plaintiff could get on and off the examination table without assistance, could move from supine to sitting without assistance and remove and put on shoes that did not have laces. She noted that Plaintiff "appeared to be cooperative, but possibly giving fair effort." (R. at 368.)

Dr. Powell ultimately opined that Plaintiff could stand and/or walk for six hours with frequent breaks and sit for six hours. (R. at 369.) Plaintiff had no manipulative or environmental limitations, but could not climb and crouch because of back and leg pain. (R. at 369.)

She opined that he could occasionally lift or carry twenty-five pounds and frequently lift or carry fifteen pounds. (R. at 369.) Because of her concern about the amount of effort the Plaintiff gave, she recommended further evaluation. (R. at 369.)

On August 26, 2010, Plaintiff reported that the TENS unit had helped, that he was sleeping about six hours a night and that his pain was around a seven out of ten. (R. at 440.) Between September 2010 and January 2011, Plaintiff had a number of therapy visits with Dr. Bonner's office. During some of these visits, Plaintiff reported an increase in pain and a decrease in function from the previous visit. (R. at 418, 420, 424, 448, 453, 462, 463, 465, 466, 474, 475.) Plaintiff also reported less pain and more function after receiving therapy. (R. at 411, 459, 464, 469, 470.) During other visits, Plaintiff reported less pain and more function than on the previous occasion. (R. at 412, 425, 447, 455.) On many visits he reported no change from the previous visit's condition. (R. at 413, 417, 421, 422, 423, 426, 451, 452, 456, 457, 458, 461, 471, 499.)

Plaintiff received steroid injections on September 23, 2010, and October 5, 2010, and he reported that it gave him immediate, yet temporary relief. (R. at 467, 503-06.) By October 21, 2010, Plaintiff reported that the injections only lasted a few hours, and while therapy had not helped his lower back and hip pain, his pain medications did. (R. at 502.)

On October 22, 2010, the reviewing state agency physician, Dr. Martin Cader, ruled Plaintiff not disabled based on an overall assessment of the documented findings. (R. at 100.) He opined that Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, crawl and lift/carry 20 pounds. (R. at 97-98.) Plaintiff should never climb ladders, ropes or scaffolds, but could frequently balance and carry 10 pounds. (R. at 97-98.) Plaintiff could perform light work,

stand or walk about six hours in an eight-hour day, and also sit for six hours in an eight-hour day. (R. at 97.)

Between November and December of 2010, Plaintiff continued to report more pain and less function. (R. at 448, 453.) On December 30, 2010, an EMG was "[n]ormal . . . without evidence for peripheral polyneuropathy or radiculopathy involving the left lower extremity motor axons." (R. at 507.)

On January 4, 2011, Plaintiff reported back spasms to Dr. Bonner. (R. at 496.) Plaintiff's medications helped with the pain and therapy was going "okay." (R. at 498.) Dr. Bonner specifically evaluated that Plaintiff had: antigravity strength with good resistance in the hip flexors, knee flexors, dorsiflexors and extensors of the great toe, and intact sensation throughout. (R. at 498.)

On January 10, 2011, Plaintiff reported less pain and more function. (R. at 447.) On January 25, 2011, Plaintiff complained that the exercise program did not work and the pain was getting worse — Dr. Bonner administered another steroid injection. (R. at 494-95.) On February 11, 2011, a steroid injection again brought immediate relief. (R. at 491-92.)

On March 3, 2011, Plaintiff's feet and toes tingled and burned, it hurt to put pressure on his left foot, and he reported that he only felt comfortable walking for five to ten minutes at a time before needing to rest. (R. at 490.) His legs felt weak, but he reported no falls. (R. at 490.) On March 3, 2010, a lumbar MRI demonstrated "a large focal disc protrusion off a mild diffuse disc bulge extending into a left lateral recess location with significant impingement on the descending nerve root at that site." (R. at 489.)

On April 12, 2011, Plaintiff saw Dr. Irby, who found that Plaintiff had intact strength in both legs, could stand on heels and toes well, and had a positive SLR on the left at 60 degrees. (R. at 510.) Plaintiff reported that his back bothered him more than his leg. (R. at 510.)

On April 28, 2011, Plaintiff visited Dr. Bonner and had his medications refilled. (R. at 486.) Plaintiff indicated that he had "declined surgery because there is no guarantee that he will improve." (R. at 486.)

On May 26, 2011, Plaintiff's pain registered at a seven out of ten, but his medications helped. (R. at 485.) He experienced tingling and numbness, though he occasionally tripped, but had never fallen. (R. at 485.) By June 23, 2011, Plaintiff's foot had worsened and he estimated that his pain continued at a rate of seven or eight out of ten, but explained that ice and the TENS unit helped. (R. at 484.) Plaintiff claimed that his foot was constantly numb, but it still felt pain. (R. at 484.) Dr. Bonner recorded his plan for an EMG for radiculopathy and Plaintiff's decision to apply for Social Security disability. (R. at 484-85.)

On July 21, 2011, Plaintiff stated that the numbness with his foot caused him to have difficulty with stairs and trip often. (R. at 483.) Plaintiff rated his pain as seven out of ten, but designated this degree of pain as "fair." (R. at 483.) He slept four to five hours a night with difficulty falling asleep. (R. at 483.) He felt sensation and had good lower extremity proprioception on the left. (R. at 483.)

On August 16, 2011, a Preliminary EMG/NCS Report showed that Plaintiff was unable to walk on his toes and his heel with constant numbness of his left foot. (R. at 513.) Plaintiff described his pain as "aching, sharp in nature, usually aggravated by activity." (R. at 513.) Plaintiff's left big toe extension and ankle dorsiflextion were 4/5, but the other muscle groups in

his lower extremity were 5/5. (R. at 513.) Plaintiff's SLR was positive at about 30 degrees for his left leg, and the EMG findings were indicative of left L5-S1 radiculopathy. (R. at 514.)

On August 19, 2011, Plaintiff reported that while his medications helped, his back pain increased from walking, standing, bending and sitting. (R. at 481.) Plaintiff's MRI revealed disc protrusion with significant nerve impingement, and Plaintiff received another steroid injection. (R. at 481.)

In a letter written on November 19, 2011, Dr. Bonner opined that he did not believe Plaintiff was ready to attempt to work. (R. at 544.) Dr. Bonner concluded that Dr. Irby's limitations were reasonable. (R. at 546.) Based on Dr. Bonner's own examinations, Dr. Irby's records and radiological studies, Dr. Bonner further opined that Plaintiff could sustain any level of work 8 hours per day, 5 days per week on a consistent basis. (R. at 546.) Further, Plaintiff's FCE may permit light to medium level work, but frequent lifting on a consistent basis could exacerbate pain levels and the ruptured disc probably would keep Plaintiff from sitting, standing or walking for long periods of time. (R. at 546.)

C. Plaintiff's Testimony before ALJ

During his hearing before the ALJ on November 14, 2011, Plaintiff stated that his back injury and medication limited his ability to think and concentrate. (R. at 32.) He experienced aching and sharp back pain in his lower back and reported feeling pain constantly — every day for a couple of hours — but that the medication helped some. (R. at 32.) He rated this pain at an eight out of ten before taking medication, but at seven afterwards. (R. at 33.) Plaintiff also felt pain in his hip and left leg, coming at some point every day, and more sharp but less consistent than the back pain. (R. at 33.) Plaintiff rated his hip and leg pain at a six or seven out of ten without medication and six after medication. (R. at 34.) Plaintiff took Hydrocodone, Flexeril,

Gabapentin and two sleep-aid medications, which collectively resulted in side effects of dizziness, tiredness and inability to think. (R. at 34.)

Plaintiff could sit comfortably for about fifteen minutes, stand comfortably for fifteen to twenty minutes and walk for about five minutes. (R. at 35.) Bending, standing, walking, cold weather and getting frustrated or stressed exacerbated his pain. (R. at 36, 44.) Plaintiff reported his pain to be at a level of seven out of ten. (R. at 36.) He laid down a majority of the day because of the pain, and would not be able to make it through the day without lying down for six hours. (R. at 36.)

Plaintiff stated that he showered and dressed himself three to four times a week. (R. at 37.) He made breakfast for himself occasionally and made dinner once a week. (R. at 37.) Plaintiff helped some with chores such as sweeping, but specified that he did no vacuuming, mopping, laundry, did not take out the trash and did not clean the bathroom or kitchen. (R. at 37-38.) Plaintiff drove his daughter to school three times a week, went out to dinner once a month, went to the grocery store twice a month and tried to attend church weekly. (R. at 39-40.) He watched television for about three hours a day, slept six to eight hours during the day and could not pick up his daughter, who weighed over 30 pounds. (R. at 40, 42.)

D. VE Testimony

During a hearing on November 14, 2011, the ALJ asked the VE to consider whether someone with inability to stand for more than fifteen minutes, inability to walk for more than five minutes or carry thirty pounds, and need to lie down six out of twelve hours could perform Plaintiff's past work. (R. at 46.) The VE indicated that such a person could not perform Plaintiff's past work and could also not perform Plaintiff's past job if that individual were limited to:

[o]ccasionally lift and/or carry including upward pulling 20 pounds and frequently lift and/or carry including upward pulling 10 pounds. The individual is able to stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour work day . . . occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds.   Frequently balance, occasionally stoop.   Occasionally kneel, occasionally crouch, occasionally crawl.

(R. at 46-47.)  However, the VE stated that jobs existed in the local or national economy that

such an individual could perform — security guard, cashier or mail clerk.  (R. at 47.)  The VE

testified that there were approximately 31,500 security guard positions, 45,000 cashier positions

and 4,600 mail clerk positions in the Virginia economy.  (R. at 47-48.)  Further, there were

approximately 1,007,000 security guard positions, 1,677,000 cashier positions and 120,000 mail

clerk positions in the national economy.  (R. at 47-48.)  The vocational expert stated that the

requirement to alternate positions between sitting and standing every twenty minutes would limit

Plaintiff to about half of the security guard positions.  (R. at 48-49.)

The VE testified that if someone with Plaintiff's history were only capable of staying on

task 85% of the time and doing sedentary work, it would reduce the number of available jobs.

(R. at 50-52.)  Such limitations would allow work as a charge account clerk with 36,000 in the

national economy and 740 in the Virginia economy, production inspector grader with 36,000 in

the national economy and 740 in the Virginia state economy, and an information clerk with

99,700 in national economy and 2,800 in the Virginia economy.  (R. at 51.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on February 19, 2010.  (R. at 166-69, 170-76.)  Plaintiff's

initial claims were denied on July 8, 2010.  (R. at 103-13.)  His request for reconsideration was

denied on October 22, 2010.  (R. at 115-20.)  An ALJ held a hearing on November 14, 2011.  (R.

at 22-60.)  On December 16, 2011, the ALJ issued a decision finding that Plaintiff was not

disabled. (R. at 7-17.) On November 14, 2012, the Appeals Council denied Plaintiff's request

for review, rendering the decision of the ALJ the final decision of the Commissioner. (R. at 1-6.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in assigning Plaintiff's treating physician's opinion less than controlling weight?

2. Does substantial evidence exist to support the ALJ's assessment of Plaintiff's credibility?

3. Does substantial evidence support the ALJ's determination that Plaintiff could perform limited light work?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court must determine

whether substantial evidence in the record supports the Commissioner's decision and whether the

proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d

470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of

relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401

(1971)).

To determine whether substantial evidence exists, the Court must examine the record as a

whole, but it may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir.

2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based

on the record as a whole, the Court must "take into account whatever in the record fairly detracts

from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks

omitted). The Commissioner's findings as to any fact, if substantial evidence in the record

supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation

omitted). While the standard is high, if substantial evidence does not support the ALJ's

determination or if the ALJ has made an error of law, the district court must reverse the decision.

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177.

An ALJ conducts this analysis for the Commissioner, and it is that process that a court must

examine on appeal to determine whether the correct legal standards were applied and whether

substantial evidence supports the resulting decision of the Commissioner. *See Mastro*, 270 F.3d

at 176-77.

The first step in the sequence is to determine whether the claimant was working at the

time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[2] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the

analysis ends and the claimant must be found "not disabled," regardless of any medical

condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the

analysis requires him to prove that he has "a severe impairment . . . or combination of

_____

[2]     SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R.
Substantial work activity is "work activity that involves doing significant physical or mental
activities. Your work may be substantial even if it is done on a part-time basis or if you do less,
get paid less, or have less responsibility than when you worked before." 20 C.F.R.
§ 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a
profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks
or hobbies, therapy or school attendance, and the like are not generally considered substantial
gainful activities. 20 C.F.R. § 404.1572(c).

impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function.  20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment, and the analysis ends.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[3] based on an assessment of the claimant's RFC[4] and the "physical and mental demands of work [the claimant] has done in the past."  20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

---

[3]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

[4]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.*

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE testifies, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

V. ANALYSIS

A. The ALJ's Opinion

After reviewing the medical evidence and Plaintiff's testimony, the ALJ followed the five-step sequential evaluation process laid out by the Social Security Administration and concluded that Plaintiff did not have a disability within the meaning of the Act.

At the first step in the sequence, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 23, 2009, the alleged onset of the disability. (R. at 12.) At the second step, the ALJ found Plaintiff to have a severe impairment in the form of degenerative disc disease of the lumbar spine. (R. at 12.) Third, the ALJ found that Plaintiff did

not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 13.)

The ALJ determined that Plaintiff had the RFC to perform light work with limitations that he "only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but should avoid climbing ropes, ladders, and scaffolds." (R. at 13, 15.) When assessing Plaintiff's credibility, the ALJ determined that his "medically determinable impairment could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 15.)

In the fourth step, the ALJ determined that, based on her assessment of his RFC, Plaintiff's past relevant work required medium exertion and skilled work and, therefore, exceeded his current residual functional capacity. (R. at 15.) Finally, the ALJ determined that Plaintiff could perform work existing in significant numbers in the national economy. Considering his age, education, work experience and residual functional capacity, she found that Plaintiff would be able to perform the requirements of representative unskilled occupations such as cashier, mail clerk or security guard. (R. at 16.)

Plaintiff argues that the ALJ erred in assigning less than controlling weight to Plaintiff's treating physician's opinion, in assessing Plaintiff's credibility and determining that Plaintiff had the RFC to perform light work. (Pl.'s Mem. at 16-30.) Defendant argues that substantial evidence supports all three of the ALJ's determinations. (Def.'s Mot. for Summ. J. and Mem. in Support ("Def.'s Mem.") (ECF No. 9) at 13-23.)

B. The ALJ did not err in assigning less than controlling weight to Plaintiff's treating physician's opinion.

Plaintiff argues that the ALJ erred in affording less than controlling weight to Plaintiff's treating physician's opinion. (Pl's Mem. at 25-27.) When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d). Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. It is clear that the regulations do not require that the ALJ accept opinions from a treating physician in every situation — specifically when the physician's opinion is inconsistent with other evidence or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6). However, those same regulations specifically vest the ALJ — not the treating physician — with the authority to determine whether a claimant is disabled as that term is defined by statute. 20 C.F.R. § 404.1527(e)(1).

Dr. Bonner opined that Plaintiff was not ready to attempt to work. (R. at 544.) Based on Dr. Bonner's own examinations, Dr. Irby's records and radiological studies, Dr. Bonner believed that Plaintiff could sustain any level of work 8 hours per day, 5 days per week on a consistent basis. (R. at 546.) Further, Dr. Bonner opined that the FCE may indicate light to medium level work, but frequent lifting on a consistent basis could exacerbate pain levels and the ruptured disc probably would keep Plaintiff from sitting, standing or walking for long periods of time. (R. at 546.) After consideration of the opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p, the ALJ gave this opinion little weight, because it was inconsistent with other evidence in the record and Plaintiff's activities of daily living. (R. at 13, 15.) Substantial evidence supports the ALJ's determination.

Dr. Bonner's own examinations specifically found that Plaintiff's pain medications were effective. (R. at 433, 481, 485, 498, 502.) Dr. Bonner's records also demonstrate that Plaintiff's physical therapy — while not consistent — often yielded less pain and more function. (R. at 411, 412, 455, 459, 469, 470, 478.) Further, Plaintiff's own testimony undermines Dr. Bonner's assessment. Plaintiff stated that he showered and dressed three to four times a week and cooked a little at home — he made breakfast for himself periodically and made dinner once a week. (R. at 37.) He helped around the house, drove his daughter to school a few times a week, went out to dinner at restaurants, traveled to the grocery store and attended church. (R. at 39-40.)

Dr. Powell's opinion also supports the ALJ's determination, as she indicated that Plaintiff could stand and/or walk for six hours with more frequent breaks and sit for six hours. (R. at 369.) She found no manipulative or environmental limitations, that Plaintiff could occasionally lift or carry twenty-five pounds and frequently lift or carry fifteen pounds. (R. at 369.)

Finally, Ms. Gallagher's Functional Capacity Evaluation conflicts with Dr. Bonner's assessment. Ms. Gallagher observed Plaintiff holding his infant daughter, being able to rise to standing without great difficulty, pass all balancing tests, and perform all activities of the evaluation. (R. at 520-21, 526, 534.) She observed Plaintiff walk 2,240 feet on a level terrain in ten minutes without any signs of physical discomfort, loss of balance or need of breaks. (R. at 525-26.) Plaintiff reported no change in pain from this walking, nor did he report a change in pain levels from climbing and descending five floors of thirteen steps without a break. (R. at 525-26, 528.) Ms. Gallagher observed Plaintiff's ability to both squat and crouch, and move into a seated position on the floor. (R. at 528.) She determined that Plaintiff could lift and carry approximately 20 to 30 pounds, carry 40 pounds for 30 feet, push or pull a 150-pound testing sled for 30 feet and perform frequent lifting of 33 pounds. (R. at 520, 529-31.) In total, Ms. Gallagher observed Plaintiff sit for a total of two hours and eleven minutes with the longest duration being one hour and two minutes, and saw him stand for a total of one hour and fifty-eight minutes with the longest duration being one hour and seven minutes. (R. at 534.) Ms. Gallagher reported that Plaintiff demonstrated the ability to perform medium levels of work, as long as there were "reasonable restrictions placed on certain activities." (R. at 542.)

Therefore, substantial evidence exists to support the ALJ's determination to afford less than controlling weight to Plaintiff's treating physician's opinion.

C. Substantial evidence supports the ALJ's assessment of Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assigning little credibility to Plaintiff's statements regarding the intensity and persistence of his pain to the extent that it affects his ability to work. (Pl's Mem. at 16-25.) In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20

22

C.F.R. §§ 404.1529(a) and 416.929(a).  The first step is to determine whether there is an

underlying medically determinable physical or mental impairment or impairments that

reasonably could produce the individual's pain or other related symptoms.  *Craig*, 76 F.3d at

594; SSR 96-7p, at 1-3.  The ALJ must consider all the medical evidence in the record.  *Craig*,

76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the

"RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis

added).  If the underlying impairment reasonably could be expected to produce the individual's

pain, then the second step of the analysis requires the ALJ to evaluate a claimant's statements

about the intensity and persistence of the pain and the extent to which it affects the individual's

ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the

available evidence," including a credibility finding of the claimant's statements regarding the

extent of the symptoms and the ALJ must provide specific reasons for the weight given to the

individual's statements.  *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

The ALJ found that Plaintiff's "medically determinable impairment could reasonably be

expected to cause the alleged symptoms," but that the Plaintiff's statements "concerning the

intensity, persistence, and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the above residual functional capacity assessment."  (R. at 14.)  The ALJ

reasoned that:

> the overall medical record does not support the alleged severity that the claimant
> asserts. . . .  The objective medical findings and the conservative nature of the
> claimant's medical care serve to diminish his credibility as to the frequency and
> severity of his symptoms.  Furthermore, his current admitted activities of daily
> living diminish his credibility regarding the extent of his functional limitations
> secondary to his impairments.

(R. at 15.)

First, substantial evidence supports the ALJ's basis for finding that Plaintiff's activities of daily living are inconsistent with his subjective complaints of intensity and persistence of pain. Plaintiff showered and dressed three to four times a week, cooked a little at home, helped around the house, drove his daughter to school a few times a week, went out to dinner at restaurants, traveled to the grocery store and attended church. (R. at 37, 39-40.)

Second, substantial evidence supports the ALJ's determination on the basis of Plaintiff's conservative medical treatment. Despite Plaintiff's claims regarding the frequency and severity of his symptoms, he decided to forgo surgery after discussing surgery on multiple occasions. In August of 2007, Plaintiff intended to undergo back surgery and went on modified duty pending that surgery. (R. at 262.) However, by February 7, 2008, Plaintiff had not followed through on the recommended surgery, and told Dr. Daniel Martin that he was not ready for surgery. (R. at 323.) On April 22, 2008, Dr. Irby again "went over the treatment options, conservative versus surgical," but Plaintiff chose to try a third injection. (R. at 319) On July 2, 2008, Plaintiff requested to have the surgery in the later part of September. (R. at 315.) On September 25, 2008, Plaintiff needed to think about surgery further. (R. at 314.) On November 25, 2008, Dr. Irby stated that he did not have anything else to offer Plaintiff other than surgery or an FCE. (R. at 313.) By December 23, 2008, surgery had been denied by Plaintiff's insurance and Dr. Irby requested an FCE for Plaintiff. (R. at 311, 517.) In January 2009, Plaintiff reported to Ms. Gallagher that he would seek surgery on his own private insurance if denied by worker's compensation. (R. at 519.) On May 28, 2009, Plaintiff told Dr. Irby that he was still interested long-term in surgery. (R. at 305.) However, by February 1, 2010, Plaintiff was not interested in surgery and decided to file for Social Security. (R. at 303.) On April 12, 2011, Dr. Irby again explained the choice of continuing pain management with Dr. Bonner or pursuing surgery. (R. at

510.) On April 28, 2011, Plaintiff told Dr. Bonner that he had "declined surgery because there is no guarantee that he will improve." (R. at 486.) On May 26, 2011, Plaintiff said he was "trying to wait it out before having surgery." (R. at 485.)

Further, substantial evidence in the record as a whole supports the ALJ's credibility assessment. Ms. Gallagher's assessment specifically undermines Plaintiff's credibility. Ms. Gallagher summarized the reliability of pain and disability reports by finding that, Plaintiff could do more at times than he perceived. (R. at 542.) Maximum Voluntary Effort Testing results suggested that Plaintiff was putting forth less than full effort. (R. at 536.) She noted multiple inconsistencies in his subjective reports and tests. For example, Ms. Gallagher stated that Plaintiff "rated his pain as 5/10 throughout end of Valpar testing and PILE, yet he was able to complete each testing task without requiring to stop activity." (R. at 542.) She further opined that the discrepancy was "significant in that a pain level of 5/10 on the Functional Pain Scale requires cessation of current activity. [Plaintiff]'s reported physical tolerance to standing and sitting differed significantly from what was observed during the FCE today." (R. at 542.) Additionally, on the Waddell Inappropriate Symptoms Questionnaire, which is used to gauge the reliability of patient's subjective reports of pain and limitations, Plaintiff suggested inappropriate illness behavior. (R. at 538-39.) While later tests indicated that Plaintiff perceived himself to be qualified for less than sedentary strength work, "subsequent clinical testing indicated that Mr. Martin's subjective reports matched poorly with distraction-based findings." (R. at 541.) Ms. Gallagher's noted that "for all Isoinertial tasks, the client was self-limited by back/leg pain and/or strength." (R. at 531).

Therefore, substantial evidence supports the ALJ's credibility assessment.

D. Substantial evidence exists to support the ALJ's determination that Plaintiff could perform limited light work.

Plaintiff argues that because substantial evidence fails to support the ALJ's determination regarding the weight afforded to Plaintiff's treating physician's opinions and Plaintiff's credibility, the ALJ incorrectly concluded that Plaintiff could perform light work. (Pl.'s Mem. at 28-30.) Defendant maintains that substantial evidence supports the ALJ's determination that Plaintiff could performed limited light work. (Def.'s Mem. at 13-15.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's impairments, the ALJ found that Plaintiff had the RFC to perform light work, except that he could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but should avoid climbing ropes, ladders and scaffolds. (R. at 13.) "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R.§ 404.1567(b). A light job "involves sitting most of the time with some pushing and pulling of arm or leg controls" and one "must have the ability

26

to do substantially all of these activities." *Id.* "If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

As determined above, the ALJ did not err in assessing the weight afforded to Plaintiff's treating physician's opinions and Plaintiff's credibility. Further, substantial evidence supports the ALJ's determination that Plaintiff could perform limited light work. Plaintiff himself indicated that he showered and dressed three to four times a week, and cooked a little at home — he made breakfast for himself periodically and made dinner once a week. (R. at 37.) He helped around the house, drove his daughter to school a few times a week went out to dinner at restaurants, traveled to the grocery store and attended church. (R. at 39-40.)

According to Ms. Gallagher's observations, Plaintiff could walk 2,240 feet on a level terrain in ten minutes, climb and descend five floors of thirteen steps without a break or increase in pain, and could frequently lift 33 pounds. (R. at 525-26, 528, 530.) Plaintiff could lift and carry approximately 20 to 30 pounds, carry 40 pounds for 30 feet and push or pull a 150-pound testing sled for 30 feet. (R. at 520, 531.)

Lastly, Dr. Cader opined that Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, crawl and lift/carry twenty pounds. (R. at 97-98.) He said that Plaintiff should never climb ladders, ropes or scaffolds, but could frequently balance and carry ten pounds. (R. at 97-98.) Dr. Cader rated Plaintiff for light work, finding that he could stand/walk about six hours in an eight-hour day and also sit for six hours in an eight-hour day. (R. at 97.) Dr. Powell opined that Plaintiff could stand or walk for six hours with frequent breaks, sit for six hours, lift or carry 25 pounds occasionally and 15 pounds frequently. (R. at 369.) Therefore, the ALJ did not err in determining that Plaintiff maintained the RFC to perform limited light work.

## VI.  CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 9) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 16, 2014